## NICK et al. v. UNITED STATES.
### No. 11861.

Circuit Court of Appeals, Eighth Circuit.

Aug. 30, 1941.

Rehearing Denied Oct. 1, 1941.

Writ of Certiorari Denied Nov. 24, 1941.

See —— U.S. ——, 62 S.Ct. 302, 86 L.Ed. ——.

664

Sigmund Bass, of St. Louis, Mo., for appellant John P. Nick.

Bryan Purteet, of St. Louis, Mo., for appellant Clyde A. Weston.

Roscoe T. Steffen, Sp. Asst. to Atty. Gen., and Marvin J. Coles, Sp. Atty., Department of Justice, of Washington, D.C. (Thurman Arnold, Asst. Atty. Gen., and Paul V. Ford, Sp. Atty., of Washington, D. C., on the brief), for appellee.

Before STONE, WOODROUGH, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

Appellants were jointly indicted on twelve counts, the first eleven of which were laid under the Anti-Racketeering Act, 48 Stat. 979, 18 U.S.C.A. §§ 420a–420e, and the twelfth count being under the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C.A. § 1. Verdict of not guilty was returned on the twelfth count and of guilty on each of the other eleven counts. The respective sentences were five years imprisonment upon each count to run concurrently and a fine of $10,000 upon the first count. From such judgments and sentences this appeal is brought.

### Statement.

Appellants were labor officials in control of a local union of operators of moving picture machines in the St. Louis area (composed of St. Louis County and the

City of St. Louis). This area was so completely unionized as to dominate operation therein. About one-fourth of the picture houses in the area were owned by the St. Louis Amusement Company and the Fanchon and Marco Service Corporation. The remainder were separately owned by persons who controlled one or more theatres and are spoken of as "independent exhibitors". The independent exhibitors were organized into an association, known as "Motion Picture Theatre Owners of St. Louis, Eastern Missouri and Southern Illinois", which acted for the owners in matters of common interest through a committee. This committee acted in arranging contracts with the union covering wages and working conditions. Such contracts were made annually for terms beginning September first. The Co-operative Sound Service Supply Company was a corporation organized and controlled by appellant Weston and in which appellant Nick was later interested. This "Co-op" furnished inspection service and maintenance services for sound equipment used in connection with exhibition of moving pictures.

### Indictment.

Excluding count twelve where the verdict was not guilty, the offenses covered by the indictment have to do with three matters. The first five counts deal with extortion of money ($6,500) by appellants from the "independent exhibitors" in connection with the wage contract beginning September 1, 1937. The next five counts are concerned with compulsory employment of the services of the Co-op. The eleventh count has to do with extortion, in 1937, of money ($2,000) by appellants from the St. Louis Amusement Company and Fanchon and Marco Service Corporation in connection with the operation of the Orpheum Theatre. Except for a fine under count one, the sentences were identical as to each count and were to be served concurrently. In this situation, we will set forth only the charge in count one confining discussion of other counts to such as is necessary to dispose of particular urged errors.

The essential averments of count one are as follows. The motion picture industry is made up of the production, distribution and exhibition of moving picture films and accompanying sound effects. The production is almost entirely in California and not at all in Missouri. Producers have contractual arrangement with "exchanges"

(usually subsidiary corporations) for the distribution of their films. These exchanges have contracts with the exhibitors (motion picture theatre owners) in their respective territories for the use (exhibition) of certain films. The films so contracted for are shipped from California to the exchange which delivers them to the exhibitor. After the films have been exhibited in a theatre, they are returned to the exchange which sends them to other exhibitors or, after final use, they are stored or reduced to their constituent chemical elements to be again made into raw film for future picture production. The ownership of the films does not change from the producers.

The value of the films as physical property is inconsequential. The value is in the use for public exhibition purposes. If exhibition be prevented in a locality, the shipment of films thereto would cease. The distribution "exchanges" located in St. Louis supply exhibitors in Missouri, Illinois, Kentucky, Iowa and Arkansas with films shipped to the exchanges from outside these States.

During the time here involved, appellant Nick was vice-president of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada—an unincorporated labor organization. Appellant Weston was business manager of the Moving Picture and Projecting Machine Operators Protective Union, Local No. 143 (located at St. Louis), of the above International Alliance.

From on or about July 1, 1936, appellants conspired to acquire control of the above Local and to use such control "to obtain the payment of money and other valuable considerations (not the payment of wages) from exhibitors of motion picture films in the St. Louis area by the use of, attempt to use, and threat to use force, violence, and coercion * * * in violation of" the above Act—such payment of money being "for their personal use and profit." The plan of conspiracy was to "make excessive, arbitrary, unreasonable, ruinous, and bogus demands for wage increases of operators employed by exhibitors in the St. Louis area, well knowing and intending said demands to be" such "and not with any purpose, intent or object of securing such increases for the said operators but for the purpose and intent and with the object of coercing the

said exhibitors to pay money and other valuable considerations to the defendants for their personal use and profit."

### Evidence.

While there was much conflict in the evidence, that introduced by the Government and some of that by defendants may be outlined as follows. All motion picture films and accompanying sound records are produced outside Missouri—almost entirely in California. These films are shipped in interstate commerce to various distributing companies (usually subsidiaries of the producers) which are located in various centers with territories which, combined, cover the country. The distributing companies license the use of the films to exhibitors (moving picture theatres) in their respective territories for exhibition purposes only and during prescribed periods. After exhibition, the films and sound records are returned to the distributors which send them to other exhibitors in their territories. Finally, the films and records are returned to the producers where they are "junked" and the material therefrom used to make new blank films and records for future production of picture films and sound records. The value of the films and records is for exhibition license purposes— the value of the physical material therein being inconsequential. Distributors located at St. Louis, Missouri, serve a territory consisting of Missouri, Kansas, Iowa, Arkansas, Illinois, Kentucky and Tennessee.

The films and records are exhibited in theatres by means of machines which are worked by skilled operators. In the St. Louis area (St. Louis County and St. Louis City), practically all of such operators are members of Local No. 143 which is affiliated with the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada. Appellant Nick was vice-president of the Alliance. Prior to 1937, he had been sent by the Alliance to St. Louis to straighten out an unsatisfactory situation which had developed in Local 143. Appellant Weston had been an investigator and agent for the Alliance in connection with troubles in Locals of the Alliance and had, prior to 1937, so operated as to Local 143 in connection with the trouble there. In 1937, he had been made business manager of Local 143 by Nick. The control of Nick over Local 143 and its membership was practically complete and his decisions and actions in its matters were so final that any protest or opposition was ineffective. The Local officers were required to resign, elections were omitted, and the executive board abolished. Nick informed members that anyone violating his orders or attempting to "go over his head" would lose his membership—which meant he could not work in this area. Nick made Weston his "personal representative" in January, 1937, when he appointed Weston as business manager and so notified the Local members.

The exhibitors (theatre owners) in the St. Louis area consisted of the St. Louis Amusement Company and Fanchon and Marco (which operated about one-fourth of the theatres) and of a number of smaller concerns (which operated one or more theatres each) known as "independents". The independents were members of an "Association" of theatre owners covering St. Louis, Eastern Missouri and Southern Illinois. This Association acted through committees in matters of common interest, including negotiation of contracts with labor unions covering wages, hours and working conditions of moving picture machine operators. Such contracts were made for a year beginning September first.

A committee of the Association negotiated with Nick and Weston for the working contract for the year beginning September 1, 1937, under a written contract between Nick and Weston for the Local and numerous theatre owners in the St. Louis area "in consideration of said Operators Local No. 143 not calling a strike or abandoning our theatres pending the conducting of the negotiations with the labor committee." These negotiations began September 8th with the presentation by Nick and Weston of a schedule of wage demands based upon classification of the theatres on the basis of seating capacity. As to all classes, the submitted list involved pronounced increases which ranged from 75% as to the most numerous class down to about 20% as to classes having a small number of theatres. These increases were such as would ruin some theatres and would seriously burden many others. The Association committee suggested there should be a reduction in existing wages but the main controversy was over the large increases demanded. Nick and Weston insisted—at times arrogantly—that such would be the wages, while the committee insisted that such increases would be ruinous and could not be paid. There were several meetings thereafter (one witness says four or five)

up to sometime about the latter half of October or early in November with no change in the situation or the attitude of the parties.

The contract for the previous year (1936) had been procured only after payment by the exhibitors of $10,000 to one Brady who claimed to be able to, and apparently did, secure results favorable to the exhibitors. When asked, in 1936, by a newspaper reporter concerning this "pay off", a member of the Association committee for 1936 (also a member of the 1937 committee) had told him the payment was for "picnics".

As the committee were leaving one of the later meetings, in 1937, one of its members remarked that it looked like "another picnic". The members were impressed with the thought that the continued demand for exorbitant increases in wages was more to secure another "pay off" than to obtain the increases demanded. Later while one of the committee members was discussing the situation with Weston, Weston stated that "for ten thousand dollars he would help get a satisfactory contract." This was communicated to other members of the committee. One of the members was opposed to any "pay off". Others thought the sum too large. Subsequent negotiations between the member and Weston resulted in an understanding for $6,500. This was followed by a meeting of the committee with Nick and Weston (above referred to as late in October or early in November) at which there was no difficulty in agreeing upon a wage agreement very materially lower than the theretofore consistently demanded scale. Up to this "pay off" arrangement, the meetings had been fruitless. At the next meeting afterward, all was harmonious and there was accord with Nick and Weston in reaching agreement. The impasse had entirely disappeared. The agreed wages were slightly higher than those for 1936. Thereafter there was some negotiation upon details. About the middle of November, the committee halted collection of this bribe money from the theatre owners because a prominent member of the committee (Kaimann) became frightened because he thought "revenue men were following him." The member who had negotiated the payment with Weston communicated this situation to Weston, on November 18th, who then told Kaimann that he had nothing to fear from that source and Kaimann resumed collections. The forenoon of November 24th, Weston called up the chairman of the committee and asked when the contract was going to be signed and stated "If the contract is not signed today, there will be no operators tomorrow, I will pull the operators." The result was a meeting of the committee with Weston at a bank that afternoon. There the contract was executed in duplicate and Weston was paid $6,500 in cash. The signature of Nick was on the contract.

### Contentions.

The contentions of appellants may be concisely stated as follows:

I. Unconstitutionality of the Anti-Racketeering Act;

II. Insufficient and defective indictment;

III. Insufficiency of evidence to authorize submission to the jury;

IV. Denial of challenge of juror Drury;

V. Failure to read indictment to jury at beginning of trial;

VI. Misstatement of character of offense made by the court in connection with empanelling of the jury;

VII. Errors as to admission of evidence;

VIII. Refusal to charge as requested;

IX. Errors in the charge as given;

X. Delivery of indictment to the jury upon submission of case;

XI. Inconsistency in the verdict.

### I. Unconstitutionality of Act.

Appellants make six attacks upon the validity of the Act as follows: (a) It denies defendants freedom of speech; (b) it violates the Tenth Amendment; (c) the Act is too broad; (d) the executive usurps the prerogative of the grand jury; (e) the Act is contradictory and meaningless, and (f) the Act is unreasonable.

(a) *Denial of Free Speech.* The argument as to denial of free speech is that the Act would punish organized labor and its leaders by making it a crime for them to communicate their wage demands to employers. This contention is unsound.

In so far as here pertinent, the Act makes it a felony to obtain, attempt to obtain or to conspire to obtain or attempt to obtain "money", "property", or "other valu-

able considerations" by use of, attempt to use or threat of force, violence or coercion.

Wages, even though obtained by the means condemned in the Act, are excepted from the statute. Not only is this exception expressed but it is emphasized by being twice stated. In section 2(a) of the Act, 48 Stat. 980, 18 U.S.C.A., § 420a(a) is the language "not including, however, the payment of wages by a bona-fide employer to a bona-fide employee." Again in section 3(b) of the Act, 48 Stat. 980, 18 U. S.C.A. § 420b(b) it states that "The terms 'property', 'money', or 'valuable considerations' used herein [in section 420a of title] shall not be deemed to include wages paid by a bona-fide employer to a bona-fide employee."

Individuals may obtain power in labor organizations which is capable of use to obtain unwilling payments from employers through bringing about or threatening to bring about violence or through coercion. So long as that power is used *solely* to obtain more wages such exercise of power is expressly excluded from the Act. It is only when such power is misused to obtain personal benefits for such individuals and not for the membership that the Act applies. The Act covers no action by a labor leader honestly acting for the members of his organization. It does cover the compulsory payment of graft to a labor leader for his own individual enrichment. Thus construed, the Act is clearly as protective to labor organizations and their membership as it is to employers. The payment of graft to a labor leader is, clearly, the purchase of his loyalty to his organization. The result is betrayal of his organization. Labor is likely to suffer more through such a sellout than the employer who, willingly or unwillingly, pays the bribe. By punishing the traitorous leader who uses his power for his personal enrichment at the expense of his organization, the Act truly is at least as protective of employees at it is of employers. The Act makes such betrayal hazardous.

 (b) *The Tenth Amendment.* The argument as to the Tenth Amendment is that this Act undertakes to invade State jurisdiction and deal with domestic violence—in short, is an attempt to exercise the police power reserved to the States under the Amendment. Clearly this is not true. The Act is an exercise of police power but it is based upon the protection of interstate commerce. If it comes within the commerce clause of the Constitution it is not open to this objection. If it does not come within the commerce clause it would be invalid whether it involved an exercise of police power or not. That the Act is within the commerce clause seems clear under National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604-606, 59 S.Ct. 668, 83 L.Ed. 1014. The Fainblatt case holds that manufacturers of articles entering into interstate commerce are within the commerce clause and subject to the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. "where the cessation of manufacture necessarily results in the cessation of the movement of the manufactured product in interstate commerce." 306 U.S. page 604, 59 S.Ct. page 670, 83 L.Ed. 1014. In that case, the "cessation of the movement of the manufactured product in interstate commerce" existed because if the clothing could not be manufactured it could not enter into interstate commerce. There the effect was upon the origination of interstate commerce. The situation before us affects the termination or purpose of interstate commerce and is just as effective in preventing such commerce. The only purpose for shipping these picture films in interstate commerce is to have them licensed or leased for exhibition purposes. If exhibitors are prevented or seriously obstructed in exhibiting the films they will not buy them. If exhibitors will not buy the films they will not be shipped in interstate commerce. In effect upon interstate commerce, there is no difference between preventing the films entering interstate commerce and in preventing them being used at the points to which they may be shipped—in either case, the films will not be shipped because of the obstruction.

 (c) *Act Too Broad.* The objection that the Act is too broad is answered, also, by the Fainblatt case, 306 U. S. pages 606-609, 59 S.Ct. 668, 83 L.Ed. 1014. The argument here is the same as answered in the Fainblatt case. It is that the Act covers things which may only remotely affect interstate commerce. The language of this Act is broad. It evinces an intention of the Congress to cover the entire constitutional range of interstate commerce in its prohibition of racketeering. We have no doubt that the actions here involved are such as come within the range of regulation under the commerce clause. In such situation, we need not trouble ourselves as to whether the lan-

guage of the Act may or may not be broader than the constitutional power. The Act certainly is valid in so far as it does not exceed that power and it clearly does not do so as to the matters here.

(d) *Executive Usurpation in Act.* The contention that the executive usurps a prerogative of the grand jury is based on a requirement of the Act, 48 Stat. 980, 18 U.S.C.A. § 420c, which is that prosecutions under the Act "shall be commenced only upon the express direction of the Attorney General of the United States." This prosecution was so commenced. Appellants' argument is that this requirement undertakes to deprive the grand jury of its statutory power to investigate crime by delegating the jurisdictional function to the Attorney General when it invests him with the power to determine who has violated the Act. This contention is unsound. The obvious purpose of this provision is for the protection of those who might be liable to the Act by requiring the consent of the highest legal official of the Government before a prosecution under the Act can be commenced. Similar provisions appear in other Acts, Federal Trade Commission Act, § 9, 15 U.S.C.A. § 49; Fair Labor Standards Act, § 9, 29 U.S.C.A. § 209. The similar provision in the Federal Trade Commission Act has been recognized as beneficial by the Supreme Court in Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 174, 47 S.Ct. 553, 71 L.Ed. 978. Appellants are in no position to challenge this provision of the Act because any possible effect thereof would be to their benefit. Also, the grand jury was not prevented from acting upon and returning the indictment here.

(e) *Act is Contradictory and Meaningless.* The contention that the Act is contradictory and meaningless is not well founded. It may be true that the Act seems loosely drawn, as stated in Judge Learned Hand's opinion in United States v. Local 807, 2 Cir., 118 F.2d 684, but it is not difficult to get its meaning that certain acts, constituting extortion, are made unlawful.

(f) *Act is Unreasonable.* The contention that the Act is unreasonable is supported by an argument which is not quite clear. It seems to be that unless the Act is construed in a reasonable manner "the United States will have assumed complete control of State offenses." It is said that this Act was designed to extend the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 Note, and 38 Stat. 730 and, therefore, the construction of those Acts should control in the construction of this Act: "with respect to intent and potential ability to actually, immediately and directly, exert an unreasonable interference with interstate commerce, as distinguished from the remote or indirect effects on commerce incident to the pursuit of an objective" (appellants' brief, p. 75). It may or may not be true that decisions construing the Sherman and Clayton Acts may be useful in construing this Act. Be that as it may, such construction cannot affect the validity of this Act.

Our conclusion is that the Act is not open to the challenges here presented.

II. Insufficient and Defective Indictment.

The indictment is attacked upon three grounds: (1) That it does not allege the act committed which is in restraint of interstate commerce; (2) that the indictment splits an alleged conspiracy into separate parts and is duplicitous; (3) that the indictment shows on its face that appellants were members of a bona-fide labor organization and negotiated wage contracts and, therefore, are exempt from prosecution under the terms of the Act.

As to the first objection, it is sufficient to say that the indictment sets forth the movement of films in interstate commerce from California to St. Louis; the method of releasing the transported films to exhibitors; the exhibitors here involved using such films, and the wrongful acts alleged to affect such use.

We are unable to get the force of the argument that the indictment is duplicitous. The counts in the indictment cover at least two conspiracies: one in connection with extorting money in return for a wage contract, and the other in connection with the employment of the Co-operative Sound Service Supply Company. Also, the indictment involves at least two separate extortion acts: the payment of $6,500.00 and the "borrowing" of $2,000.

The argument under the third contention seems to lead to the result that the Act could never apply if the extortionist was a member of a legitimate labor organization and the extortion occurred in connection with negotiations relating to wages. This cannot be true. The criterion is whether there was extortion for the individual benefit of the extortioner, and

that may occur in connection with wage negotiations as is clearly shown by the facts of this case. The indictment is sufficient.

### III. Insufficiency of the Evidence to Justify Submission.

We have carefully considered the evidence in the light of the argument of appellants as to its sufficiency to justify submission to the jury. We have not thought it necessary to discuss or even to state herein the evidence as to other than the first count of the indictment because the sentences on all other counts are less than that on the first count and run concurrently therewith. However, we should state that the evidence as to compulsory use of the sound service (covered in counts six to ten, inclusive) and as to the so-called loan of $2,000 by Harry C. Arthur, Jr., to Weston in connection with the opening of the Orpheum Theatre (covered by count eleven) has been fully examined and is sufficient to justify submission to the jury on the counts of the indictment involving those transactions. There is no doubt that the evidence was amply sufficient for submission upon all counts of the indictment. It reveals the sorry picture of two labor leaders who used their power of control over a local union to extort money from employers for their own private personal profit.

### IV. Denial of Challenge of Juror Drury.

During empanelment of the jury, a member of the panel, Mr. Drury, was challenged for cause as being disqualified for jury service because he was a deputy constable. It is contended that the statutes of Missouri, sec. 699, R.S.Mo.1939, Mo.St.Ann. § 8748, p. 4692, prevents such service. That section exempts but does not disqualify a constable to serve as a juror. The language is that no such officer "shall be compelled" to serve as juror. The statute extends a privilege but does not state a compulsion. This is emphasized by other sections (sections 742, 758 and 807, R.S.Mo. 1939, Mo.St.Ann. §§ 8787, 8803, 8745j, pp. 4711, 4716, 4691) which set forth that "None of the following persons *shall be permitted* to serve as jurors" (italics added). Drury was examined by the court as to whether the fact that he was a law enforcement officer might influence him or whether he felt any prejudice in favor of the Government or against an accused person in a criminal case. He was peremp-

torily challenged by appellants later. There is no contention as to any prejudice through denial of the challenge for cause.

### V and X. Indictment and the Jury.

The first of these contentions is that there was error in not reading the indictment to the jury at the opening of the trial. The second is that there was error in giving the indictment to the jury, at the close of the trial, because the Act was referred to therein as the "anti-racketeering act". As to the first contention, it is enough to say that it was not necessary to read the indictment at the opening of the trial. Counsel for all parties made full opening statements covering the issues in the case. In addition, no word of objection or of exception to the omission to read the indictment appears in this record. The second contention is frivolous. The Act is popularly known as the "anti-racketeering act". It was passed primarily to prevent and punish racketeering. To tell the jury that the Act was what it was had no possible harmful connection with the fact of the guilt or innocence of one on trial for violation of it.

### VI. Misstatement of Offense on Empanelling Jury.

This contention is trivial. The court stated very briefly the situation with expressed warning that no full or accurate statement was intended but only such as necessary for qualifying jurors. At the conclusion of this statement, counsel objected because the court had not included a specified feature. At once, the court said: "All right, Exception is not necessary. I will accept the counsel's further statement as a further application of the type of the charge."

### VII. Errors as to Evidence.

This topic covers admission of different pieces of evidence which appellants contend were erroneous. They are treated in appellants' brief under two headings.

The first heading is concerned with the testimony of witness Tomsen and of witness Kaimann which has to do with the reputation of persons seen about the headquarters of this labor local. There is no assignment of error as to any of this evidence. Therefore, it is out of our consideration.

The second heading is concerned with the testimony of several witnesses which

appellants contend is inadmissible hearsay. While appellants assert that such character of evidence was permitted in connection with the testimony of twelve witnesses, they call attention to instances in the testimony of but nine witnesses. We need consider only these specific instances as it is fair to assume that they are the ones deemed by appellants to be most objectionable.

The first of these is witness Wehrenberg. To understand the criticized evidence it is necessary to state briefly the situation of which it is a part. The act of extortion involved in this situation is the compelled payment to appellants of $6,500 by the so-called independent exhibitors at St. Louis—this payment going to appellants for their personal profit in order to secure a certain wage contract covering the services of moving picture operators who were members of this local union. The negotiations for a wage contract began in September, 1937, and continued until in November, 1937. The negotiations were conducted by appellants on the part of the union and by a committee representing the exhibitors. At some of the meetings (particularly the earlier ones) it seems that the above committee was present. At the later conferences, the committee seems to have been near the place of conference but it was represented by a member thereof who conferred with appellants out of sight and hearing of other members of the committee. In one such conference Kaimann was the member of the committee holding such private conference; and at another Arthur so acted. Upon leaving each of these two conferences, Kaimann or Arthur, respectively, reported the happenings thereat to other members of the committee awaiting him.

The criticized testimony of witness Wehrenberg is his statement of a remark made by Kaimann in such a report. Kaimann on the stand testified he had made the remark which Wehrenberg testified he heard. This remark was that it looked to Kaimann like there was to be another "picnic". Related to this testimony is another criticized portion wherein Wehrenberg sought to explain the meaning of the term "picnic" by relating the substance of a conversation Kaimann had, in 1936, with a newspaper reporter in regard to a similar extortion transaction connected with the 1936 wage contract. It seems that the reporter had obtained information that the

exhibitors had paid money in connection with the 1936 contract and was questioning Kaimann as to the purposes of such payment when Kaimann replied that it was for "picnics" and other purposes.

 Of course, this testimony is hearsay but it was admissible here for the purpose to which the evidence was expressly confined by the court. The court limited this character of evidence to the purpose of showing the state of mind of the committee representing the exhibitors as to why this payment of $6,500 was necessary. This money was raised subsequently by the committee from the exhibitors and paid over to Weston. The gist of the unlawful act is extortion. Extortion involves a state of mind as an element of an offense under the Act. Unless there is some form of compulsion (either physical or fear) there is no crime under this Act. If the exhibitors had paid this money of their own initiative and voluntarily there would have been no violation of the Act. It was, therefore, essential to show that such payment was under such compulsion. The existence of this compulsion might be proved in several ways but one proper way is to show the state of mind under which the committee acted. The purpose of this evidence, as repeatedly limited by the court, is not to prove what was said at the conference between Kaimann and appellants or that the situation thought to exist by Kaimann and other members of the committee really existed. It is to show the state of mind of Kaimann produced by the transaction and that his conclusion was communicated to other members of the committee. Whether Kaimann was justified in reaching such conclusion is an entirely different matter. Whether justified or not, that was the conclusion which he stated and which, undoubtedly, had its effect upon the minds and the future actions of the members of the committee in making this payment.

 As to the testimony concerning Kaimann's conversation with the newspaper reporter in 1936, it was not introduced for the purpose of proving the truth of the subject matter of such conversation. It was solely to define the expression "picnic" as used by Kaimann when he communicated his views to the committee. The conversation with the reporter had nothing to do with the issues of this case otherwise than as just set forth but it was necessary to know what "picnic" meant to

understand this statement of Kaimann to the committee and their understanding of its meaning.

■ Another criticized piece of testimony by Wehrenberg is that he was permitted to testify concerning a telephone conversation he had with Thimmig, who was another member of the exhibitors' committee. This criticism is not well founded since the ruling of the court was that the conversation should be eliminated except in so far as it bore upon the state of mind of the exhibitors. The conversation had to do with the urgency of collecting the $6,500 which was being collected by Thimmig and other members of the committee and was entirely proper.

Other criticized items are in the testimony of witness Thimmig and are concerning the same matters as covered by the testimony of Wehrenberg, above discussed.

■ The brief calls attention, in one sentence, to conversations witness Kaimann had with Thimmig who had, apparently, gone to appellant Weston's office for the purpose of arranging this "pay off" and had reported back to Kaimann. These conversations were, essentially, a part of the negotiations leading up to the payment of the $6,500 and were entirely proper.

■ Two other pieces of criticized testimony were from witness Komm. In the first of these Komm was permitted to state his opinion as to the result the demanded wage increase would have had upon the ability of the exhibitors to continue business. Komm was an exhibitor and a member of this committee. His testimony was to the effect that he and other exhibitors would have had to go out of business had the wage scale been that upon which appellants were first insisting and which was reduced upon payment of the $6,500 extortion money. Such statement has nothing to do with hearsay. It was pertinent as bearing on the element of compulsion. The criticism stated to this evidence is that it was the statement of a conclusion and should have been preceded by testimony showing the income and upkeep of a theatre under another wage scale. The statement of the conclusion is proper. The verity of the conclusion was open to test on cross-examination either by the character of inquiry suggested in the criticism or otherwise.

■ The other criticized testimony by Komm is to a telephone conversation with Thimmig in which Thimmig stated that the failure of Komm to make his contribution to the $6,500 fund was holding things up and that Komm had better give him this money or he would not have any operators in his theatre. This testimony, obviously, bears upon the compulsion and is proper.

Criticism is made also of testimony by Louis K. Ansell and by Joseph Ansell. Each of these men was an exhibitor. The criticized testimony is the same in each case and is as to what Arthur had said to the committee immediately following a conference between him and appellants. This conversation is of precisely the same character as that of Wehrenberg and Thimmig concerning Kaimann's remark when he reported to the committee after a meeting with appellants and is covered by what is heretofore said concerning that testimony.

■ Another criticized piece of testimony is from witness Arthur and relates to a conversation he had with the Ansells and Bess Schueler regarding their attitude on making a "pay off" if the matter should come up. This conversation is pertinent upon the matter of compulsion. Besides it consists merely of a statement that Arthur had a discussion with the Ansells and Bess Schueler at the time this "pay off" was being discussed and asked them if they were agreeable if the thing came up in that manner. It contains no statement of their reaction thereto.

■ Two other pieces of criticized testimony are from witness Rosecan. The first of these has to do with conversations with Tom Canavan in connection with the use of sound apparatus. Canavan was in charge of a concern (dominated by appellants) which furnished sound apparatus in connection with moving pictures. When various members of the exhibitors' committee conferred with appellant Nick concerning sound equipment, Nick referred them to Canavan. The conversations here in question are such as witness had with Canavan concerning the sound devices after being directed to him by Nick. They have direct bearing upon the compulsion exercised by appellants toward the exhibitors and were competent. The second piece of Rosecan's testimony is as to a conversation with one of the Ansells concerning the use of sound equipment. It bears directly upon the matter of compulsion.

The remaining piece of criticized testimony is by witness Sanowski. This is precisely the same kind of testimony as given by witness Rosecan as to conversations with Canavan.

There was no error in the admission of any of this testimony to which our attention is called in the brief.

## VIII. Denial of Request to Charge.

Appellants state in their brief that they presented twenty-three requested instructions which the court refused to give "but possibly covered the last five in its charge." The sole statement, in the brief, concerning the other instructions not conceded to be covered in the charge as given is as follows: "By refusing to give the first nineteen instructions, the Court ignored the defendants' theory of the case —indeed, ignored the law. Had the Court given these requested instructions, the case would have been understood by the jury. Lack of space compels us to forego a seriatim consideration of requests; however, as the Court reads the unfair and prejudicial charge given, the Court's errors in refusing them will become obvious." The passage just quoted clearly amounts to no more than that the court committed errors in refusing nineteen requests. Where or what those errors were is not even suggested. This Court is left to seek for errors which counsel do not or cannot point out. Such a presentation offers nothing here for review. If counsel wish this Court to pass upon errors in any of these requests it is their prerequisite duty to point out specifically those errors and to state the reasons why such are errors.

## IX. Errors in the Charge Given.

The argument upon the suggested errors to the charge covers slightly over sixteen pages in the brief. As a whole, it is a running fire upon the general unfairness of the charge with discussion of several specific instances. As to many of these instances there was no assignment of error or no proper assignment under the Rules. There are but five matters which are covered by any assignment or by a proper assignment under the Rules.

The first of these (assignment 29(h) is aimed at the statement in the charge that it is not necessary for the jury to find that the defendants, in conspiring, considered that the effect of their conspiracy would be to affect interstate commerce or that one of the purposes of the conspiracy was to affect such commerce. Obviously, this statement by the court is correct. All that is necessary is that the conspiracy shall be to do something, the natural effect of which will be to affect interstate commerce.

The second item (assignment 29(i) is directed at a statement by the court that "if the evidence of the witnesses outlining the effect of stoppage of the motion picture industry in St. Louis is to be believed and is believed by you, the result, of course, is direct and substantial interference with or effect upon interstate commerce." The criticism is that this is an improper comment upon the evidence and is argumentative in that it states to the jury that if they believe certain evidence they must believe that there is direct and substantial interference with interstate commerce. There is no proper basis for this criticism. It is not for the jury to determine what is or what is not interstate commerce—that is a question of law. It is for the court to charge the jury that if certain facts covered by the evidence are shown then there is such interference. This is what the court stated and its statement is proper.

The third item (assignment 29(m) is levelled at a statement by the court that "unless the Government has proven guilt beyond a reasonable doubt, a conviction must ensue." It is obvious that if the court used the word "conviction" instead of "acquittal" such was merely a slip of the tongue and that it would be quite obvious to the jury that such was the case. However this may be, this matter was called to the attention of the court in connection with the exceptions to the charge and the court promptly and effectively corrected the misstatement.

The fourth item (assignment 30) is aimed at a statement by the court to the effect that if appellants had in mind two purposes in extorting the money—one to enrich themselves and the other to gain proper wages for the members of the union —the fact that one purpose was unlawful under the Act would justify conviction. Much is made that such a view is in the teeth of the prohibition in the Act (Section 420d), the argument being "that no court of the United States shall construe or apply any of the provisions" of the Act "in such manner as to impair, diminish, or in any manner affect the rights of bona-fide labor organizations in lawfully carrying

out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States." It seems to us an astonishing proposition that labor racketeers can coerce employers or anybody else to give them personal bribes in connection with wage negotiations and then escape punishment under this Act if any benefit in wages is obtained in those negotiations. Obviously, the only purpose or possible reason for employers bribing such racketeers in connection with wage negotiations is to secure lower wages than honest negotiations would probably produce. How such a situation could possibly result in anything but harm to the innocent members of the labor organization is not clear. It must be true that such innocent members are best served by representatives who honestly try to procure the best wages possible and who have no divided, much less bribed, allegiance in such negotiations.

 The final item (assignment 31) is to that part of the charge which appellants denominated as a "so-called Allen instruction." The argument is that this portion of the charge was "extremely coercive and practically urged the minority to give in to the majority and 'vote for a conviction'." There have been criticisms of this general character of instruction in several cases cited by appellants. It seems to us any vice in this kind of statement depends upon the situation at the time it is given and upon the language used by the court. The objection is, of course, that such character of instruction may have coercive effect upon jurors. If such statement is made in the face of an existing disagreement in the jury it is quite evident that its entire force would be felt as applying to an existing situation which had developed. Language which might be innocent if uttered before submission of the case to the jury might be regarded as harmful if applied to a specific existing disagreement. Here the caution was given as part of the charge before submission. The language used by the court seems careful and temperate. It contains no suggestion of coercion and we cannot see how any reasonable member of

the jury could believe that he was not entirely free to disagree if he felt such was his duty.

## XI. Inconsistent Verdict.

 The position of appellants in regard to their claim that the verdict is inconsistent is based on the situation that the verdict was guilty upon the first eleven counts for violation of the "anti-racketeering Act" while it was not guilty on the twelfth count for violation of the Sherman Act. As stated in the brief, the supporting argument is as follows: "By acquitting the defendants on the twelfth count, the jury thereby found them not guilty of interfering or restraining interstate commerce, because interference and restraint of interstate commerce were the primary essentials of the twelfth count. Interference with interstate commerce was the primary charge in each of the first eleven counts. If the jury found there was no interference with interstate commerce under the twelfth count, which was predicated upon precisely the same facts as each of the first eleven counts, then to be consistent the jury should have found, and was under a duty to find, no interference with interstate commerce under any count."

The interference with interstate commerce punishable under the "anti-racketeering Act" is entirely different from that covered by the Sherman Act. The Acts are directed at different evils. This count twelve charged (as it must have) a conspiracy to control interstate commerce in films. The other counts charged extortion made effective through control over a local labor union. Testimony which would have sustained the twelfth count might utterly fail as to the eleven counts and vice versa. There is no inconsistency in the verdict. As to the effect of inconsistency (even where such exists) in a verdict, see Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161.

## Conclusion.

Upon the whole case our conclusion is that there is no error and that the judgments should be, and are, affirmed.