**UNITED STATES v. COMPAGNA et al.**

No. 103.

Circuit Court of Appeals, Second Circuit.

Dec. 20, 1944.

Writ of Certiorari Denied April 2, 1945.

See 65 S.Ct. 912.

William Scott Stewart, of Chicago, Ill., for appellants Compagna, deLucia, D'Andrea, Gioe, and Rosselli.

J. Bertram Wegman, of New York City, and Harold Simandl, of Newark, N. J. (Emanuel H. Reichart, of New York City, of counsel), for appellant Louis Kaufman.

Vito Marcantonio, of New York City, for appellant Maritote.

Francis Biddle, Atty. Gen., and Boris Kostelanetz, Sp. Asst. to the Atty. Gen., of New York City (Raymond P. Whearty and Amedeo L. Lauritano, Asst. U. S. Atty., both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

Compagna and six others have appealed from convictions for violation of subdivision (d) of § 420a, Title 18 U.S.C.A.: a conspiracy to extort money from producers and exhibitors of moving pictures during the years 1935 to 1940. They rely upon some twenty assignments of error, of which the first and the most important is that there was not enough evidence to support the verdict. Since the case against Kaufman is somewhat different from that against the rest, we will reserve consideration of his appeal until we have disposed of those of the others. The only other alleged errors of any consequence concern the general conduct of the trial: e. g., the admission of supposedly incompetent evidence, the judge's charge, the prosecutor's misconduct, and the fact that the judge spoke to the jury out of court after they had retired. For a discussion of the constitutionality of the statute—also an assigned error—we need only refer to Nick v. United States, 8 Cir., 122 F.2d 660, 138 A.L.R. 791.

To an intelligent understanding of the appeal, it is necessary to give an outline of the general venture in which the accused were involved, as the jury might have found it from the testimony. The fabric of this was woven out of the testimony of two accomplices—Bioff and Browne; par-

ticularly that of Bioff, a man with a long, discreditable and criminal past, confessedly guilty of perjury in an earlier examination of the same transactions here in question. Their story was in substance as follows. Browne had been a member and business agent for the Chicago local of an international trade union of stage hands and moving picture machine operators, which covered the United States and Canada. In 1932 he ran for president of the union and was defeated. Shortly thereafter he met Bioff, who already knew the accused and others of their kind and had engaged in illicit operations with them. The record does not definitely disclose the nature of the original association of these two men, but a jury might find it too to have been illicit. In any event, they made more money than they had been used to having and spent it freely enough to attract the attention of one Circella, who kept a night club in Chicago, and who was one of a group, or gang, of confederates who lived by blackmail. The cupidity of these men became aroused by this news; and, after preliminaries unnecessary to detail, they forced upon Browne and Bioff an agreement by which they should receive, first one-half and, later two-thirds of all that the two might collect from moving picture exhibitors. Among the confederates were, not only the appellants here, but a number of others—among them, Circella, already mentioned. The first step was to elect Browne president of the union, in which they succeeded. Circella and Bioff were then given offices in the union as personal representatives of Browne, as president, and both drew salaries. Early in 1935 all had been arranged, and Bioff and Browne, who were to be the spearheads, began to blackmail exhibitors of moving pictures in Chicago. So far as appears, they did not expressly threaten violence, but confined themselves to a pretence of union activity; that is, they threatened to call strikes against their victims unless they were plentifully paid. Among their earliest victims was an exhibitor in Chicago, one Barger, who operated a small theatre, and whom Bioff forced to share equally with him all Barger's profits. Later, by the same pressure, Bioff imposed upon this unfortunate man as employees: first, Maritote, and later, D'Andrea, neither of whom rendered any services whatever, but who were paid $175 a week and later, $200. By the autumn of 1935 the enterprise had apparently become

so profitable that Bioff extended it to New York. One Basson was the local agent of the New York local, and had undertaken negotiations for a wage increase with some large exhibitors in that city, with the threat of a strike as a sanction; but Bioff, speaking for Browne, without whose consent no strike was regular, intervened and upon the payment of $150,000 from the exhibitors collectively, refused to permit the strike.

Until the beginning of 1936, the collections had all been from exhibitors, either in Chicago or New York, but early in that year the group decided to include producers, who, as is well known, produce films for the most part in California. It had been the custom of the industry to have an annual meeting each year in New York between representatives of the various unions in the industry and of the producers; and in 1936 Bioff went to this meeting and met Schenck, a representative of a large producer. Bioff threatened to close up the theatres of exhibitors throughout the country unless Schenck could raise a very large sum from the producers generally. After some higgling, the two finally agreed upon a schedule, or tariff, by which the larger producers were each to pay annually $50,000; and the smaller, $25,000. The group found the threat of a strike against the theatres more effective a sanction than a strike against the producers themselves; for, by stopping the outlets they could entirely paralyze the production of films. The arrangement so concluded lasted almost until the indictment was filed on March 18, 1943, and resulted in the collection of over $600,000, in addition to nearly $500,000 collected from exhibitors.

The evidence connected all the accused now at bar with this undertaking, although for the most part this was through the testimony of Bioff, corroborated in some degree by Browne. As is so often the case in criminal appeals, we are asked to reverse the conviction because the testimony on which the verdict was based was incredible; as always, we reply that that question is not for us, but for the jury. If, viewing the situation as a whole, they chose to believe Bioff, their conclusion was final. Coming to the individuals separately, nothing need be said about Compagna; Bioff connected him with the venture in the most direct way; apparently he was the chief. To deLucia Bioff repeatedly paid part of the blackmail; and,

on occasion, he did the same to Gioe, though not so often. Circella introduced Rosselli to Bioff as the representative of the group in California; Bioff arranged to pay him a part of the money extracted from the producers in that state, though the payments were disguised by bookkeeping designed to hide the nature of the transaction. As we have already said, Maritote and D'Andrea were given sinecures in the business of Barger, at weekly payments of from $175 to $200. It was impossible to doubt—nothing being shown to the contrary—that men, receiving such payments in such a way, were privies to the scheme. They could not have supposed that they were bona fide employees of Barger; nor is it tenable to assume that a ruthless and grasping crew of blackmailers would provide soft berths for subordinates who were ignorant of the general nature of the undertaking of which they were the beneficiaries. We start therefore with the hypothesis that all of the accused now at bar were parties to a blackmailing conspiracy of wide scope, long duration, and vast returns.

It is apparent that such a conspiracy was within the statute, provided that the threats used to extort the money were "coercion," as defined in subdivision (a) of § 420a; and provided further that the extortion was "in connection with" an act "affecting" interstate commerce. To take up the second point first, it was enough proof of the effect of their acts upon interstate commerce, that the group found it more effective, when they were blackmailing the producers, to threaten them with a strike against the theatres. Nothing could more completely illustrate the unity of ·the whole industry; all its parts were like those of a single elastic member in which an impact upon one part is instantly transmitted everywhere. Moreover, not only would the producers feel the check upon the interstate movements of their films when the exhibitors were tied up; but since many of the exhibitors did business on a small margin, and must have a constant supply of films to keep going at all, a very short cessation of that supply at the sources might destroy them, and end them forever as outlets. If these were the facts, the business was interstate as matter of law, and the question should not have been submitted to the jury; and since nobody contested the facts, but only their legal effect, it was unneces-

sary for the judge to say anything on the issue. Coming back now to the first of the questions we just put, the accused "coerced" exhibitors and producers, if it was "coercion" to threaten them with strikes. The statute does not, indeed, make it a crime to force a rise in wages by such a threat; the twice expressed exception that it shall not apply to the payment of wages would alone prove that, as indeed would the general purpose to be drawn from the whole. But if the accused at bar were not concerned in any wage dispute, but threatened to call strikes, not in the interest of the workmen, but to feather their own nests, they "coerced" their victims within the meaning of the section. The judge should have left to the jury nothing more than he did.

The indictment having been filed on March 18, 1943, it was necessary to show that it continued until March 18, 1940, and there was evidence in plenty that it did, although several of the accused were not shown to have continued their connection with it as late as that. To meet this lapse in the evidence as to them, the prosecution invoked the well established doctrine that anyone, once shown to have been a member of a conspiracy which lasts until the beginning of the statutory period, must satisfy the jury by affirmative proof that he disconnected himself from it before that period began. So the judge charged, and he was quite right; we have so lately affirmed such a ruling that we need only refer to the authorities on which we then relied. United States v. Cohen, 2 Cir., 145 F.2d 82, 90.

We do not find it necessary to discuss the several alleged variances between the indictment and the proof; neither cumulatively, nor in detail, could they have misled the defence; the substance of the charge and the proof were in entire accord. All the accused and a number of others were engaged in a single enterprise, understood by all to be such: a common engagement to prey upon the fears of producers and exhibitors wherever there was a likely opening. It is curious that today in the face of § 556 of Title 18 U.S.C.A., it should still be supposed that we would concern ourselves with the trivial challenges to the indictment which are here put forward as a ground for reversal. The same is true of most of the assigned errors, touching the judge's rulings upon evidence and his charge. With one exception which

we shall take up in a moment, these were of no importance; and would not even have been of importance, had the result been less inevitable than it was. We shall not consider the others in detail, but content ourselves merely by referring to § 391 of Title 28 U.S.C.A.

■ Two questions do arise, however, which seem to us to require an answer. After the jury had been locked up, they sent out a note, asking that Barger's testimony against D'Andrea should be read to them; and the judge, who had apparently left the court room, on his way back to it "stopped in the jury room and asked them if that is what they meant about that, if they wanted it read. They said yes. I told them they could go to lunch and we would get it ready and read it to them when we came back." The testimony was read to them after lunch, not including the cross examination, which they apparently did not want to hear. At any rate, since the accused did not ask to have it read, they are in no position to complain of the omission. As to the visit of the judge, it is true that courts are extremely jealous of anything of the kind, once the jury has been locked up; and we do not wish to abate that jealousy in the least; it is most undesirable that anything should reach a jury which does not do so in the court room. This is, indeed, too well settled for debate. Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917; Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 81, 39 S.Ct. 435, 63 L.Ed. 853; Dodge v. United States, 2 Cir., 258 F. 300, 303, 304, 7 A.L.R. 1510; Little v. United States, 10 Cir., 73 F.2d 861, 864, 865, 96 A.L.R. 889. But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity. Dodge v. United States, supra, 258 F. 300, 7 A.L.R. 1510; Rice v. United States, 2 Cir., 35 F.2d 689, 696; United States v. Graham, 2 Cir., 102 F.2d 436, 444. There cannot be the slightest doubt here that the informality—for, at most, it was no more —did not prejudice the accused.

There remains only one question, as to the method of dealing with which my brothers and I are not in entire accord, though we agree in the result. During the trial the prosecution called a number of exhibitors or producers who testified that Bioff threatened to call strikes in their theatres or film studios, if they would not comply with his demands. As we have already said, he did not threaten them with violence, but the judge allowed the prosecutor to ask whether, when they paid the blackmail, they had been moved by fear of violence; and in a number of instances they said that they had. Moreover, they were further allowed to say what their fears had been: i. e., that during other strikes there had been stoppages of film machines in the middle of a performance; stink bombs had been set off in the theatres; members of the audience and recalcitrant exhibitors had been assaulted. Against all this testimony the accused vigorously protested at the time, and they particularly press its admission upon us now as error.

■ If the indictment had charged the substantive crime of extorting money by "coercion," there would, we all think, have been no doubt of the relevancy of such testimony; it would have been necessary in that case to prove that the "coercion" had induced the payments, as to which the victims would obviously have been the best source of information. They would know why they paid the money, and, the issue once open, no prosecutor should be limited to the bare statement that the threat had been the motive; the victim would be allowed to show in detail just what fears the threat aroused in him. Since, however, the crime was a conspiracy, and not the crime of blackmail itself, we all agree that it was not necessary for the prosecution to prove that the conspiracy was successfully executed: that is, that any money had been in fact "obtained." My brothers think that, even so, it was relevant to show that the scheme proved successful as part of the proof that there had been a scheme at all. They believe that there is a rational connection between the existence of the criminal agreement—the "partnership in crime"—and the fact that the acts upon which the conspirators agreed, when carried out, had the expected effect upon those against whom they were directed. They further believe that, even if this connection be not perfectly faultless in logic, the distinction is too formal and too fine drawn to be treated seriously, and that we should not strain to enlarge its importance. For these

reasons they believe that we should hold that it was not an error at all to admit the testimony.

It seems to me, on the other hand, that the only evidence relevant to the existence of a conspiracy are facts which come, or at least might have come, to the knowledge of the conspirators, among which, obviously, the undisclosed mental states of mind of the victims in the case at bar could not be. What they told Bioff of their reasons for paying him was of course relevant, for it would be part of the nexus of information with which all were charged in the prosecution of their common enterprise; it became a part of their mutual understanding. But I cannot see how what they did not tell, could be relevant. It is difficult to learn from the report of Nick v. United States, supra, 122 F.2d 660 at pages 671, 672, 138 A.L.R. 791 whether that case supports my brothers' views; I, at least, am not sure whether the indictment was for the conspiracy—there clearly was one—or the substantive crime. The reasoning seems to indicate that it was for the second; yet the crime is spoken of as a conspiracy. But, although I think that it was an error to admit the testimony, I do not believe that it requires us to reverse the convictions. It might have done so, if the victims had based their fears upon what the accused had done in the past; but the testimony did not in this way covertly convey to the jury an accusation of earlier and independent crimes. Indeed, it did not appear that any of the accused on trial had ever called a strike in the past. (Kaufman may have, but not in Chicago, where these victims did business.) The victims' fears originated from acquaintance with the general disorders and violence which had accompanied other strikes. As such, it was part of what everybody knows, and I cannot see how it could have prejudiced the accused with the jury. Indeed it was entirely proper for the jury to infer that the accused expected to play upon precisely such fears, when Bioff threatened to call strikes.

We are satisfied that the accused had an impartial trial, and that no honest jury could have failed to convict them. The crime struck at the heart of civilized society; its very possibility is a stain upon our jurisprudence. The convictions are affirmed.

## Kaufman's Case

The chief difference between Kaufman's appeal and that of the others, is in the evidence against him, a summary of which is as follows. Among the producers were Warner Brothers who, through a subsidiary, had been exhibiting films in New Jersey under a wage-scale contract with the local which expired on September 1, 1936. In August of that year the "zone manager" of Warner Brothers, Jacocks, sent his personnel manager, Morgenroth, to negotiate a new contract with a committee of the union, who were accompanied by three officers of the local, one of whom was Kaufman, the local agent of the New Jersey local. The committee dropped out during the negotiations, and early in October Warner Brothers reached an agreement with Kaufman and his two colleagues. Shortly thereafter Jacocks drew out $15,000 in cash and gave it to Morgenroth, who on the next day gave it to Kaufman. Morgenroth asked him at the time whether he had to "split" the money "with any of the other fellows"—meaning the two other officers of the local—and Kaufman answered that he did not, and that they knew "nothing about it"; but he added that he did not get a cent, because "I have to go across the river." Somewhat later Jacocks also had a talk with him in which he said "that he had to take that money over the river and turn it over, and he did not get any of it." The 1936 contract expired at the end of August, 1939; and there were again preliminary conferences between officers of the local and Warner Brothers; but this time Kaufman was alone, after the wage-scale committee had retired. He then asked for $10,-000, telling Jacocks that he had had to pay to Bioff the whole $15,000 received in 1936. The parties finally agreed that he should have $5,000 in two instalments which were paid in 1939 and 1940. At the time the second instalment was paid he for the third time declared that the whole of the first payment had gone to Bioff.

Bioff's story was that Kaufman had come to him, had told him that he was having trouble in getting an increase of wages for his men from Warner Brothers, and had asked him whether he could "help." Bioff had then gone to Phelps—the "labor contact man" for Warner Brothers—who told him that Kaufman was unreasonable and threatened to strike, and

that Phelps was looking to Bioff "to see to it that we get straightened out." Bioff answered that he would not let Kaufman strike, but Phelps should "get straightened out with Kaufman even if it costs some money." Bioff swore that Kaufman had never paid him any part of the money, and that when he had complained of this to Nitti, Nitti had told him to let it pass, because Kaufman was Zwillman's "man" and would arrange the matter with him. Bioff protested that this was irregular, but took no measures to force the payment. The only other testimony connecting Kaufman is that in the spring of 1934 when several of the group were discussing how to elect Browne as president of the union, one Buchalter had said that he would see to it that a person named Zwillman "delivers Kaufman."

If the jury believed Bioff, they could scarcely have avoided the conclusion that, when Jacocks and Morgenroth paid Kaufman $15,000 to settle the difficulties which had arisen about the new wage-scale contract, it was because Bioff had intervened with Warner Brothers on Kaufman's behalf, as Kaufman had asked him to do. It is true that the money did not go to raise wages, which was what Kaufman had said he wanted, but nevertheless Kaufman had accepted it, and there was every probability that it had been paid to avoid a break down in the negotiations, and a consequent strike. If, in addition to this, Kaufman told the truth when he said that he had paid the whole amount to Bioff, no other conclusion was possible than that he was a party to the general conspiracy. Obviously, he would not have done so, unless he expected some equivalent, either by way of profit or of immunity. There may be honor among thieves, but there is no maudlin munificence. The jury was free to disbelieve this part of Bioff's testimony and to convict Kaufman on his own declaration. On the other hand, it would make no difference, if in fact they thought that Kaufman never did pay the money to Bioff. When Kaufman said that he had paid it, he was saying in substance that the money had been collected for Bioff, and he could not have been unaware that Bioff was not acting for himself. Not only was Kaufman therefore acquainted with the conspiracy, but he wished his hearers to understand that he was engaged in it. If in fact he was as faithless to his accomplices as he had been to his local, that did not disprove that they were his accomplices as he had implied; and the jury might take him at his word.

There remain certain questions as to the competency of testimony admitted against him. In 1934 when some members of the group were discussing the election of Browne as president, as we have just said, Buchalter told them that Zwillman would see to it that Kaufman would turn the vote of the New Jersey local. This may have been inadmissible when Bioff testified to it, but we have never held, and we do not think, that the order of proof is important. As soon as it appeared from the testimony we have just set out, that Kaufman later became connected with the conspiracy, all evidence became competent against him, of whatever had been theretofore done in its execution. Van Riper v. United States, 2 Cir., 13 F.2d 961, 967; Coates v. United States, 9 Cir., 59 F.2d 173, 174; Lefco v. United States, 3 Cir., 74 F.2d 66, 68, 69. The declaration in question was not narrative; it was an act in furtherance of the common enterprise. Again, Bioff's talk with Nitti about bringing Kaufman to account for the payment of $15,000, was of the same kind, except, indeed, for the added fact that it was after Kaufman was shown to have joined. Next, the testimony as to what Kaufman said at a public meeting, held after Bioff's doings began to be bruited, was susceptible of being understood as a threat against any present who should testify against him. It was competent under the plainest principles, and its admissibility did not depend upon its truth. If it "prejudiced" Kaufman, that was precisely its entirely laudable purpose. Finally, Kaufman's interview with Jacocks in 1932 was also admissible. If a bully begins a negotiation by laying a firearm on the table, it is not relevant merely as such to negotiations with another person. But if later negotiations with the same person come in question and the issue includes the motives which actuated that person, it is highly relevant to show how the acquaintance began. That is too obvious to deserve elaboration.

The supposed excesses of the prosecutor in his summing up to the jury, we have already dealt with upon an application for bail; we then said, and we now repeat, that he did not go beyond "permissible limits."

Judgment affirmed as to all the appellants.