**UNITED STATES of America**
v.
John C. KUBACKI and Abraham Minker.
Cr. No. 21468.

United States District Court
E. D. Pennsylvania.
Jan. 7, 1965.

Drew J. T. O'Keefe, U. S. Atty., Thomas F. McBride, Henry S. Ruth, Jr., Sp. Attys., Department of Justice, Washington, D. C., for plaintiff.

Edwin P. Rome, Philadelphia, Pa., for defendant Kubacki.

B. Nathaniel Richter, Philadelphia, Pa., for defendant Minker.

LUONGO, District Judge.

Minker and Kubacki were found guilty by a jury on all five counts of an indictment charging (Count I) conspiracy to violate, and (Count II) the substantive violation of 18 U.S.C.A. § 1951,[1] and (Count III) conspiracy to violate

1. "§ 1951. Interference with commerce by threats or violence.

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

 * * * * *

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. * * *"

and (Counts IV and V) substantive violations of 18 U.S.C.A. § 1952.[2] Their separate Motions for Acquittal and for New Trial are before me.

 The convictions stemmed from events surrounding the purchase of parking meters by the City of Reading during a period when defendant Kubacki was its mayor, and defendant Minker was allegedly a behind the scenes political power. There was evidence from which the jury could find, on the first two counts, that in connection with the purchase of 500 Duncan-Miller parking meters from the Koontz Equipment Company by the City of Reading, the defendants conspired to and did obtain from a representative of Koontz the sum of $3,000 for awarding the contract to Koontz. There was evidence from which the jury could find, as to the remaining counts, that defendants conspired to, and did, cause others to travel in interstate commerce to distribute $7,500 and a valuable clock, in payment for the award of a contract for 500 parking meters to the Karpark Corporation.

Defendants' motions for acquittal will be granted as to Counts I and II, and denied as to Counts III, IV and V. Of the many reasons advanced by the defendants in support of their motions, only two will be discussed at any length, although all have been thoroughly considered.

### Sufficiency of Evidence of Extortion under 18 U.S.C.A. § 1951

 By definition, the essential ingredient of extortion under § 1951 is "wrongful use of actual or threatened force, violence, or fear * * *." Although the context in which "fear" is used in that definition suggests apprehension of physical harm to person or property, it is clear that fear of economic loss is sufficient. Bianchi v. United States, 219 F.2d 182 (8th Cir. 1955), cert. den., 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249; Cape v. United States, 283 F.2d 430 (9th Cir. 1960); United States v. Palmiotti, 254 F.2d 491 (2nd Cir. 1958). The government contends that fear of economic loss was established as to Counts I and II. The evidence, viewed in the light most favorable to the government,[3] bearing on that contention is as follows:

Roger Weidlich was a salesman for Koontz Equipment Company which sold parking meters manufactured by Duncan-Miller. In January 1960, Weidlich went to Reading to meet the new mayor, Kubacki, to discuss the sale of Duncan-Miller parking meters to the City. Kubacki indicated a need for approximately 2,000 meters but that they could not all be purchased at the same time. Kubacki asked Weidlich to submit a proposal for 500 meters and at the same time suggested a $12 to $15 per meter "political donation," indicating that he was aware that money had been kicked back on meters purchased by the previous administration. Kubacki asked Weidlich to keep in touch with Wade, Chief of Police. Later Weidlich was taken by Wade to see Minker who confirmed that a political contribution would have to be made at a certain amount per meter before he would get an order for parking meters. It was Weidlich's state of mind that he "would either have to make the donation * * * or lose the order."

---

2. "§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity;

\* \* \* \* \*

and thereafter performs or attempts to perform any of the acts specified in sub-

paragraphs (1) * * * shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means * * * (2) extortion or bribery in violation of the laws of the State in which committed or of the United States. * * *"

3. United States v. Nedley, 255 F.2d 350 (3d Cir. 1958).

Weidlich communicated the demands to Roach, an executive of the Duncan-Miller Company, and obtained from him an agreement to offer not more than $6 a meter. This was the price at which, ultimately, the "deal" was consummated and a contract for 500 Duncan-Miller meters was awarded to Koontz in return for which Weidlich made a cash payment of $3,000 through Wade.

In 1962, Weidlich spoke to Kubacki about an order for more parking meters to be purchased by the Reading Parking Authority. There were discussions in which Kubacki promised to exercise his influence with the Parking Authority in an effort to obtain the order for Koontz and there were discussions of the means by which payment was to be made, apparently involving a subagency contract with an alleged co-conspirator. The efforts with the Parking Authority did not culminate in the award of a contract to Koontz.

In the indictment (Count I) the government charged that Weidlich and Roach were in fear that "offers to sell parking meters * * * would not be considered for acceptance unless" they would consent to pay the amounts demanded. In simple terms, the government charged that these people were compelled to make a payoff for the privilege of bidding, i. e., for the privilege of competing for the award of the parking meter contract. The evidence established, instead, that Weidlich and Roach were bargaining for improper influence, for favored treatment, i. e. they were bargaining for the improper award of the contract to them without the necessity to compete.

In all the extortion cases cited by the government, the victim was compelled to pay for the exercise or enjoyment of a right or privilege already his, under threat and out of fear that if he did not comply with the demands he would be subjected to unwarranted interference, with resulting substantial harm to his business or property rights.[4]

■■■ The definition of extortion used in § 1951 is taken from New York law [United States v. Nedley, 255 F. 2d 350 (3d Cir. 1958)] and New York interpretations of that crime are helpful. Under New York law, the crimes of bribery and extortion are mutually exclusive. One who pays a bribe is equally as guilty as the one who receives it, "which could never be the case with extortion." People v. Dioguardi, 8 N.Y.2d 260, 273, 203 N.Y.S.2d 870, 881, 168 N.E.2d 683, 692 (1960). The court in Dioguardi noted the distinction between bribery and extortion, the essence of the one being the voluntary giving of something of value to influence the performance of official duty, the essence of the other being duress. Applying that distinction to this case, the record is devoid of evidence of duress. While Weidlich and Roach spoke of fear that they would not "get the order," there is nothing to

4. Payments to union leaders as price for avoiding unwarranted work stoppages, Bianchi v. United States, 219 F.2d 182 (8th Cir. 1955), cert. den., 349 U.S. 915, 75 S.Ct. 604 (1955); United States v. Stirone, 311 F.2d 277 (3d Cir. 1962), cert. den., 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963); Cape v. United States, 283 F.2d 430 (9th Cir. 1960); United States v. Provenzano, 334 F.2d 678 (3d Cir. 1964); United States v. Varlack, 225 F.2d 665 (2d Cir. 1955); People v. Lamm, 292 N.Y. 224, 54 N.E. 2d 374 (1944), or as price of labor peace, United States v. Kemble, 198 F.2d 889 (3d Cir. 1952); Hulahan v. United States, 214 F.2d 441 (8th Cir. 1954), cert. den., 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954); United States v. Palmiotti, 254 F.2d 491 (2d Cir. 1958); Callanan v. United States, 223 F.2d 171 (8th Cir. 1955); People v. Hughes, 137 N.Y. 29, 32 N.E. 1105 (1893), or to prevent strikes without legitimate union purpose, United States v. Compagna, 146 F.2d 524 (2d Cir. 1944), cert. den., 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945); Nick v. United States, 122 F.2d 660, 138 A.L.R. 791 (8th Cir. 1941), cert. den., 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941), or to end picketing after legitimate objects no longer existed, People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E. 2d 683 (1960); People v. Barondess, 133 N.Y. 649, 31 N.E. 240 (1892).

raise that fear above the level of disappointment over failure to obtain a new piece of business. There is nothing in the record to show the harm, if any, either to Weidlich's economic well being, or that of the Koontz Equipment Company or of the Duncan-Miller Company from failure to obtain the order for parking meters. This lack is in sharp contrast to the evidence of fear of destruction of or substantial harm to the businesses involved in the cases cited in footnote 3, supra.

Reasonable minds could only arrive at the conclusion that what was involved in this case was bribery. If Weidlich and Roach had any fear at all, it was fear that they would not be successful in their efforts to exercise undue influence. That is not the type of fear contemplated in § 1951. They were "victims" only to the extent of possible dissatisfaction with the price, otherwise it is clear beyond question that they were willing participants, equally as guilty as the payees, in the scheme to obtain the award of the contract improperly.

■ The evidence in this case is insufficient, as a matter of law, to sustain conviction on charges of extortion and defendants are, therefore, entitled to acquittal on Counts I and II. Their motions for acquittal on Counts I and II will be granted. In the alternative, in the event that this grant of the motions for acquittal is held to be erroneous, the convictions of both defendants on Counts I and II are set aside as being against the weight of the evidence and defendants' motions for new trial are granted on those counts.

### Ex Post Facto Application of 18 U.S.C.A. § 1952

On September 13, 1961, § 1952 was enacted, making it a crime to use interstate facilities in aid of unlawful activities, defined to include bribery and extortion under the laws of any state.

Under the laws of Pennsylvania, bribery and extortion are defined as follows:

"53 P.S. § 35910. Receipt of bribe by officer or employe of city

"Any member of council, or other city officer or employe, who shall solicit, demand, or receive, or consent to receive, directly or indirectly, for himself or for another, from any company, corporation, or persons, any moneys, office, appointment, employment, testimonial, reward, thing of value or enjoyment or of personal advantage, or promise thereof, for his vote or official influence, or for withholding the same, or with an understanding, expressed or implied, that his vote or official action shall be in any way influenced thereby, or who shall solicit or demand such money or other advantage, matter, or thing, aforesaid, for another, as the consideration of his vote or official influence, or for withholding the same, or who shall give or withhold his vote or influence in consideration of the payment or promise of such money, advantage, or thing to another, shall be guilty of bribery, a felony * * *."

"18 P.S. § 4318. Extortion [5]

"Whoever, being a public officer, wilfully and fraudulently receives or takes any reward or fee to execute and do his duty and office, except such as is or shall be allowed by some act of Assembly, or receives or takes, by color of his office, any fee or reward whatever, not, or more than is, allowed by law, is guilty of extortion, a misdemeanor * * *."

Counts III, IV and V were laid under § 1952 and under the general conspiracy statute, 18 U.S.C.A. § 371. Defendants' *ex post facto* argument is that when the contract was awarded to Karpark (prior to September 13, 1961), the state crime of bribery was complete and, when com-

---

5. Not to be confused with the definition of "extortion" in 18 U.S.C.A. § 1951 which differs materially.

mitted, violated no federal law. Applying § 1952 to that conduct, defendants argue, operates to make illegal that which was (federally) innocent when defendants acted.

■■ The fallacy of defendants' argument is that it places undue emphasis on the state crime of bribery. The prohibited conduct under § 1952 is interstate travel [6] or use of interstate facilities in aid of or to distribute the proceeds of unlawful activities. The state crimes of bribery and extortion [7] serve only as a background identification of the unlawful activities in aid of which the proscribed travel was undertaken. The interstate travel did not take place until December 1961, several months after the effective date of § 1952. It was undertaken for the purpose of making the payoff contemplated as the *quid pro quo* for the award of the contract. The plan to do all these things had its origin early in 1960. Upon the adoption of § 1952 on September 13, 1961, the plan, contemplating as it did use of interstate facilities and interstate travel, became an unlawful conspiracy under federal law. Membership of the defendants in the theretofore federally innocent plan was then converted to membership in an unlawful conspiracy. That conspiracy continued until the accomplishment of the last of its objects, delivery of the money and the clock. Without more, this might well have warranted conviction in the absence of proof of withdrawal, since membership, once established, is presumed to continue until an affirmative showing of termination by acts of disavowal or withdrawal. See United States v. Markman, 193 F.2d 574 (2d Cir. 1952), cert. den. sub nom., Livolsi v. United States, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed. 1371 (1952); Ny-

quist v. United States, 2 F.2d 504 (6th Cir. 1924). But the matter was not submitted to the jury on that basis. The jury was instructed, instead, that it could only convict the defendants if it was satisfied beyond a reasonable doubt that, after September 13, 1961, acts in furtherance of the plan and in affirmance of it, with its then unlawful object, were committed by the defendants. There was evidence of such acts after that date, e. g. Kubacki forwarded installation information necessary for the manufacture of the meters; he signed the certification of receipt of the meters on the basis of which the payment on account was made (it was from that payment that Karpark realized the cash with which to make payment of the cash portion of the bribe); he received and accepted the clock at his home; Minker gave instructions to Hughes, the Karpark official, as to the place where and the person to whom to deliver the cash (from which the jury could infer that the cash was accepted and received on Minker's behalf for distribution in accordance with his directions). Under such instructions, defendants' argument as to the *ex post facto* application of § 1952 lacks substance. United States v. Perlstein, 126 F.2d 789 (3d Cir. 1942), cert. den., 316 U.S. 678, 62 S.Ct. 1106, 86 L. Ed. 1752 (1942); Bailey v. United States, 5 F.2d 437 (5th Cir. 1925). See also, United States v. Goldberger, 197 F.2d 330 (3d Cir. 1952), cert. den., 344 U.S. 833, 73 S.Ct. 40, 97 L.Ed. 648 (1952).

### Competence of Wade

■ Defendants assert that the government's star witness, former Chief of Police Wade, should have been declared incompetent because he was an admitted perjurer, was testifying under a grant

6. Actually, in this case, defendants are charged with "causing" interstate travel which, under the provisions of 18 U.S. C.A. § 2(b), makes them chargeable as principals.

7. Defendants' argument on the *ex post facto* point overlooks the state extor-

tion aspect of the case. Extortion under Pennsylvania law, as hereinbefore set forth, consists of the *receipt* by a public official of a fee or reward for doing his duty. Neither the clock nor the money had been received by Kubacki or the councilmen prior to the date of enactment of § 1952.

of immunity and was an unindicted accomplice. Such facts did not render him incompetent, they were all factors for the jury to consider, under appropriate cautionary instructions, in assessing his credibility. Rosen v. United States, 245 U.S. 467, 38 S.Ct. 148, 62 L.Ed. 406 (1918); United States v. Margolis, 138 F.2d 1002 (3d Cir. 1943); United States v. Segelman, 83 F.Supp. 890 (W.D.Pa.1949).

Charging Multiple Conspiracies as One

 The complaint is that the 1962–63 Parking Authority transaction should not have been lumped as part of one conspiracy with the 1960 transaction between the City of Reading and Koontz Equipment Company. Since I have granted defendants' motions for acquittal on Count I in which this complained of conspiracy was charged, the question is really moot, but were it not, I would rule that it was not prejudicial to defendants since there was evidence from which the jury could have found both transactions were part of one conspiracy. Moreover, since both Minker and Kubacki were involved in all the transactions, the reason for the rule against charging multiple conspiracies as one, i. e. the danger of transference of guilt, is not applicable. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Prejudicial Cross Examination of Kubacki

 Kubacki testified on direct that he had never solicited or received anything of value as a condition or inducement for approving a contract on behalf of the City of Reading. On cross examination he was asked a series of questions relating to specific instances of alleged solicitation from persons doing business or seeking to do business with the City. To each he answered denying that he had done so. When government counsel disclosed, after several such questions and answers, that his purpose was to lay the groundwork for rebuttal testimony to refute the denials, the court ruled that he would not be permitted to go into such collateral matters on rebuttal, sustained objection to further questioning along that line, ordered the questions and answers already given stricken and instructed the jury to ignore them. In light of the ruling and the instructions, it is hard to see how defendants could have been prejudiced by the mere asking of such questions, particularly in light of Kubacki's denials which the government was not permitted (perhaps erroneously, see Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); White v. United States, 317 F.2d 231 (9th Cir. 1963)) to refute.

Defendants' motions for acquittal and for new trial on Counts III, IV and V will be denied.