Filed 5/3/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JAMES VERNON JOSEPH, JR.<br><br>     Defendant and Appellant. | A153494<br><br><br>(Contra Costa County<br>Super. Ct. No. 5-160639-1) |

From 2001 to 2015, James Vernon Joseph, Jr. and Avisa Babaei Lavassani ran a lucrative and violent sex trafficking enterprise. A jury convicted Joseph of 19 felonies against several victims, including conspiracy to commit human trafficking (Pen. Code, §§ 182, subd. (a)(1), 236.1)[1] and numerous sex offenses, including 14 counts of rape (§ 261, subd. (a)(2)). The trial court sentenced Joseph to a lengthy prison term.

Joseph appeals. He contends: (1) the conspiracy conviction violates the ex post facto clauses of the state and federal Constitution; (2) the court erred by denying his motion for acquittal for improper venue; (3) the court lacked territorial jurisdiction over counts 17 through 21, the rape charges against

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion, parts II and IV.

    [1] Undesignated statutory references are to the Penal Code. Lavassani is not a party to this appeal and is mentioned only where necessary.

Jane Doe 5; and (4) the statute of limitations barred certain sex offenses.  As we explain, Joseph relies on his ex post facto argument as a basis, in whole or in part, for several of his other claims.

We conclude Joseph's ex post facto claim lacks merit and reject all of his other claims except his territorial jurisdiction claim.  We conclude the court lacked territorial jurisdiction over those charges, which were committed in North Carolina.  Accordingly, we reverse counts 17 through 21.  We affirm the remaining convictions.

FACTUAL AND PROCEDURAL BACKGROUND

A.

*Charges*

In 2016, the prosecution filed an indictment against Joseph.  The operative indictment charged Joseph with 21 felonies against five victims: conspiracy to commit human trafficking (§§ 182, subd. (a)(1), 236.1, subd. (b), count 1); human trafficking with the intent to pimp or pander (§§ 236.1, subd. (b), 266h, 266i, count 2); kidnapping for rape (§ 209, subd. (b), count 3); kidnapping for extortion (§ 209, subd. (a), count 4); 14 counts of rape (§ 261, subd. (a)(2), counts 5 to 9, 12 to 15, and 17 to 21); two counts of sodomy (§ 286, subd. (c)(2), counts 10 and 16); and forcible oral copulation (former § 288a, subd. (c)(2), count 11).

The indictment also alleged Joseph committed rape, sodomy, and forcible oral copulation against multiple victims (§ 667.61, subds. (c), (e)(4)) and that Contra Costa County had jurisdiction (§ 781).

B.

*Overview of Prosecution Evidence*

1.    <u>Jane Doe 1 (Counts 1 and 5–11)</u>

In March 2001, a woman approached Doe 1 at a shopping mall in Monterey and asked whether Doe 1 would be interested in traveling and doing makeup. Doe 1 took the woman's business card. Later, Doe 1 interviewed for the position and "got the job." She met the woman at a restaurant to fill out employment paperwork. At the meeting, Doe 1 "felt like something was wrong," so she left.

As Doe 1 approached her car, Joseph drove up next to her. Another man "forcefully" pulled Doe 1 into the car. Joseph drove to a house in Livermore, where he and his companion carried Doe 1 inside and took off her clothes. Then Joseph held Doe 1 down, and raped and sodomized her. Joseph locked Doe 1 in a bedroom.

A short time later, Joseph introduced Doe 1 to Lavassani, his most senior prostitute. Lavassani told Doe 1 she would be having sex with men for money, and that Joseph would be her pimp. Then Joseph took Doe to her first appointment. On the way there, Joseph forced Doe to orally copulate him. After the appointment, Doe 1 gave the money to Joseph and begged to go home. He refused. Doe 1 lived in the Livermore house with several other prostitutes.[2]

Joseph forced Doe 1 to prostitute herself throughout the Bay Area. Doe 1 had prostitution appointments in Walnut Creek, and she was driven through Walnut Creek on her way to other appointments. Doe 1 also traveled to other states for the purpose of prostitution. Joseph assaulted Doe

---

[2] Additional prostitutes lived at Joseph's houses in Tracy and Manteca. Joseph lived in various places, including Livermore, Danville, and San Ramon.

1 and raped her at least 10 times. He controlled every aspect of Doe 1's life through a regime of violence and fear until March 2002, when Doe 1 was taken into police custody.

### 2. Jane Doe 2 (Counts 1 and 12–14)

In late 2001, Doe 2 met with Joseph at a nightclub in San Francisco, where he promised her a "modeling contract" and a "great life." Then Joseph took Doe 2 to a hotel in the East Bay to discuss "modeling." Doe 2 asked to leave, but Joseph refused. He made Doe 2 undress and forced her to orally copulate him. Joseph also raped Doe 2. Shortly thereafter, Doe 2 moved into Joseph's house in Tracy, where he raped her several times. Later, Doe 2 moved to Joseph's house in Livermore.

Joseph forced Doe 2 to prostitute herself. Like Doe 1, Doe 2 was taken to prostitution appointments all over the Bay Area. Later, Joseph forced Doe 2 to prostitute herself in New York, Washington D.C., and Miami. In 2002, Doe 2 was taken into police custody in New York.

### 3. Jane Does 3 and 4 (Counts 1 and 15–16)

In late 2001 or early 2002, Joseph approached Doe 3 at a mall in Pleasanton and offered to provide her with modeling opportunities where she would travel and make money. It sounded exciting, so Doe 3 agreed. Shortly thereafter, Doe 3 moved into Joseph's house in Manteca or Tracy, where at least one of Joseph's prostitutes lived. Later, the plan "changed," and Joseph told Doe 3 she would move to Georgia to model and "go on dates" with men. As Joseph drove Doe 3 from California to Georgia, they got into an argument. Joseph pulled the car over and raped Doe 3 "on the hood of the car."

When Joseph and Doe 3 arrived in Atlanta, they checked into a hotel where Joseph sodomized Doe 3. With Doe 3's encouragement, Doe 4 moved to Atlanta. Joseph raped Does 3 and 4 in Atlanta. Joseph prepared Doe 3 and

4

Doe 4 to prostitute themselves but Doe 3 escaped and returned to California before she had to go on a prostitution appointment.

### 4. Jane Doe 5 (Counts 1, 2, and 17–21)

In 2013, Joseph approached Jane Doe 5 at a restaurant in Alabama and asked her if she "wanted to model." Doe 5 agreed. Joseph took Doe 5 back to his hotel, where he told Doe 5 that she would start her modeling career by "sleeping with men" for money. Joseph acknowledged what Doe 5 would be doing was illegal, but assured her she would be " 'safe.' " He also claimed his prostitution operation was like a " 'family.' " Doe 5 quit her job and put her belongings in storage.

Joseph drove Doe 5 to North Carolina. In North Carolina, Joseph raped Doe 5 several times. Doe 5 started working as a prostitute in June 2014. She worked in North Carolina and New York. Doe visited California a "couple times on holidays." In February 2015, she obtained a California driver's license. Three months later, Doe 5 traveled to San Francisco for breast augmentation surgery. Doe had the surgery to improve her chances of landing a modeling contract. Doe 5 spent two weeks in California recovering from the surgery. Then she returned to New York, where she was later taken into police custody.

### 5. Police Investigation

Police arrested Joseph at his home in Danville in August 2015. During the investigation, police found condoms, lubricant, and emergency contraceptive medication. They also found large amounts of cash, expensive cars, jewelry, and designer clothes and accessories. Police also recovered Doe 5's birth certificate and her passport. Police obtained text messages from Joseph and Lavassani's cell phones discussing the human trafficking operation.

An expert in forensic accounting determined Joseph and Lavassani deposited the proceeds of the prostitution enterprise into shell corporations. From 2013 to 2015, the enterprise generated between $111,960 to $223,920 per month.

## C.

### *Verdict and Sentence*

The jury acquitted Joseph of counts 3 and 4, which involved Doe 1. It convicted Joseph of the remaining charges and found the multiple victim allegation true. The court sentenced Joseph to 159 years, plus 15 years to life, in state prison.

## DISCUSSION

## I.

### *The Conspiracy Conviction Did Not Violate the Ex Post Facto Prohibition*

Joseph's first claim is the conviction for conspiracy to commit human trafficking violated the ex post facto clauses of the federal and state Constitution. According to Joseph, the "agreement," and many of the overt acts in furtherance of the conspiracy, took place before section 236.1 criminalized human trafficking.[3]

A.    Background

Count 1 charged Joseph with conspiracy to commit human trafficking and alleged overt acts occurring between 2001 and 2015: overt acts 1 through 27 occurred in 2001 and 2002; acts 28 through 34 occurred in 2014

---

[3] Section 236.1—which took effect in 2006—prohibits human trafficking, defined as "depriv[ing] or violat[ing] the personal liberty of another with the intent to obtain forced labor or services," or with "the intent to effect or maintain . . . violation[s] of" various laws regulating, as relevant here, prostitution, pimping, and pandering. (§ 236.1, subds. (a), (b); Stats. 2005, ch. 240, § 7.)

and 2015.  Before trial, Joseph moved to dismiss count 1 pursuant to section 995.  He argued the charge violated the ex post facto prohibition because the conspiracy as to overt acts 1 through 27 was completed before human trafficking became a crime in 2006.

The prosecution disagreed, contending there was no ex post facto violation because the charge alleged "a continuing course of conduct that straddle[d]" enactment of section 236.1.  The court denied the motion and the jury convicted Joseph of count 1.

B.    Conspiracy

A conspiracy consists of two or more persons conspiring to commit any crime.  (§ 182, subd. (a).)  "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy.  [Citations.]  [¶]  Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy."  (*People v. Morante* (1999) 20 Cal.4th 403, 416–417, fns. omitted.)

Conspiracy is a unique crime which "attaches culpability at an earlier point along the continuum than attempt.  'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' "  (*People v. Johnson* (2013) 57 Cal.4th 250, 258.)  "Conspiracy separately punishes not the completed crime, or even its attempt.  The crime of conspiracy punishes the agreement itself."  (*Id.* at p. 258.)  But an agreement to commit a crime does not, by itself, complete the crime of conspiracy.  "The commission of an overt act in furtherance of the agreement is also required.  'No agreement amounts to a conspiracy, unless some act, beside such agreement, be done

7

within this state to effect the object thereof, by one or more of the parties to such agreement . . . .' [Citation.] . . . Once one of the conspirators has performed an overt act in furtherance of the agreement, 'the association becomes an active force, it is the agreement, not the overt act, which is punishable. Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself.' " (*Id.* at p. 259; § 184.)

C.      No Ex Post Facto Violation

The federal and state Constitution prohibit ex post facto laws. (*People v. Grant* (1999) 20 Cal.4th 150, 158–159 (*Grant*).) An ex post facto " 'law is one which defines a new crime and applies its definition retroactively to [punish] conduct which was not criminal at the time it occurred.' " (*In re E.J.* (2010) 47 Cal.4th 1258, 1277.) "The prohibition against ex post facto laws seeks to achieve two important goals. First, it assures 'that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.' [Citation.] Second, the rule 'restricts governmental power by retraining arbitrary and potentially vindictive legislation.' " (*Grant,* at p. 158.) We review an ex post facto claim de novo. (*In re Sampson* (2011) 197 Cal.App.4th 1234, 1241.) A conviction that violates the ex post facto prohibition must be reversed. (*Stogner v. California* (2003) 539 U.S. 607, 632–633.)

A law does not operate ex post facto unless it "changes the legal consequences of acts *completed* before its effective date." (*Weaver v. Graham* (1981) 450 U.S. 24, 31, italics added, criticized on another point as stated in *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506, fn. 3.) The ex post facto prohibition does not encompass "continuing" or "straddle" offenses, which begin before the statute takes effect and are completed after it. (*Grant, supra,* 20 Cal.4th at pp. 159–160; *People v.*

8

*Chilelli* (2014) 225 Cal.App.4th 581, 589, 590.) Because " 'ex post facto' means 'after the fact' " not " 'during the fact,' " it "does not encompass offenses for which the defendant is prosecuted or punished based on acts continuing beyond a change in the law." (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 531.)

There is no ex post facto violation here, because the conspiracy straddled the effective date of the statute: it began before section 236.1's effective date and continued well after that date. (*Grant, supra,* 20 Cal.4th at pp. 160–161.) Our conclusion is supported by numerous cases holding there is no ex post facto violation where the conspiracy continues after the effective date of the statute. (*United States v. Kohl* (9th Cir. 1992) 972 F.2d 294, 297 [rejecting ex post facto claim where the defendant committed overt acts before and after enactment of statute]; *United States v. Canino* (7th Cir. 1991) 949 F.2d 928, 951–952 [no ex post facto violation where prosecution established "existence of the conspiracy" before and after effective date of statute]; *United States v. Campanale* (9th Cir. 1975) 518 F.2d 352, 365 [criminal conspiracy which commenced before, but continued beyond the effective date of the statute, was "not *ex post facto* as to that crime"].)

Joseph asserts "[i]t violated the ex post facto provisions to allow the jury to find *an agreement* to violate section 236.1" before that statute took effect. (Italics added.) Joseph's focus on the "inception" of the "agreement" is unavailing. Joseph and Lavassani's plan may have originated before section 236.1 criminalized human trafficking, but that plan was "converted to membership in an unlawful conspiracy" when section 236.1 took effect. (*United States v. Kubacki* (E.D. Pa. 1965) 237 F.Supp. 638, 642–643.) And that conspiracy continued well after the effective date of the statute: the prosecution offered evidence that Joseph committed human trafficking after

9

the enactment of section 236.1 and Joseph did not establish he withdrew from the conspiracy at any point.[4] (*United States v. Canino, supra,* 949 F.2d at p. 952 [defendants did not prove they withdrew from conspiracy that began before statute's effective date]; *People v. Hardy* (1992) 2 Cal.4th 86, 144 [conspiracy ends when the substantive crime is accomplished or defeated].)

II.

*The Improper Venue Argument Fails*

Next, Joseph challenges the denial of his motion for acquittal for improper venue. Joseph's precise argument is somewhat opaque, although it appears to be tied, at least in part, to the ex post facto claim. Joseph devotes dozens of pages in his opening brief to the venue argument but does not identify the counts he claims should have been dismissed until the final sentence. Throughout his argument, Joseph simply refers to "counts" relating to Jane Does 1, 2, and 3. Then, without citing the record, Joseph claims venue was improper because the unspecified crimes occurred outside Contra Costa County. Additionally, Joseph claims it was "error" to deny the

---

[4] Overt act 34, which involved Doe 5, occurred in California after the passage of section 236.1, which satisfies the requirement that an overt act be done in this state " 'to effect the object' " of the conspiracy. (*People v. Johnson, supra,* 57 Cal.4th at p. 259.) While the jury was properly instructed that it must find at "least one of the overt acts was committed in California," it did not make a specific finding regarding that act, although it convicted Joseph of count 2, which encompassed Doe 5's claims for the same 2014–2015 time period. There is no dispute that many overt acts in California were found for the period before the enactment of section 236.1. At least one court, cited with approval by our high court in *Grant*, has held there is no ex post facto violation even if *all* of the overt acts in furtherance of the conspiracy occur before the statute's effective date, so long as the defendant does not withdraw from the conspiracy after the statute becomes effective. (See *Grant, supra,* 20 Cal.4th at p. 160, fn. 4, citing *United States v. Canino, supra,* 949 F.2d at pp. 951–952.)

motion for acquittal but he does not discuss section 1118.1, the burdens of the parties in the trial court, or the applicable standard of appellate review. Joseph's reply brief suffers from similar problems.

A.     Background

After the prosecution rested, Joseph moved for acquittal on several charges pursuant to section 1118.1.  He argued venue was improper because the crimes occurred outside of Contra Costa County.

In opposition, the prosecution argued venue in Contra Costa County was proper under section 781, which expands venue to places where preparatory acts "requisite to the consummation of the offense" have been committed.  The prosecution explained that "during the course of the conspiracy there were multiple incidents, trips through, and engagements in Contra Costa County" and that the "situs points of the conspiracy" were in San Ramon and Danville, which granted "jurisdiction over all of the rest of the counts.  [¶]  And this includes the rapes . . . wherever they occurred, because . . . the rapes were part and parcel of making all the [victims] more compliant, amenable, to the trafficking."  The prosecution also noted the effects of the offenses were felt in Contra Costa County.  Finally, the prosecution argued Joseph waived the venue objection by failing to raise it before trial.

The court granted the motion as to two counts and denied the motion as to the remaining counts.

11

B.    Joseph Forfeited the Improper Venue Claim by Failing to Object Before Trial

Joseph's venue claim is forfeited.[5]  "[A] defendant who wishes to object to venue in a felony proceeding must make a specific objection to venue prior to the commencement of trial.  A defendant who fails to raise such an objection prior to trial ordinarily will be deemed to have forfeited such a claim." (*People v. Simon* (2001) 25 Cal.4th 1082, 1107–1108.)  Here, Joseph did not object to venue before trial.  Instead, he waited until the prosecution rested; then he moved for acquittal based on improper venue.  Joseph forfeited "his challenge to the propriety of venue by not timely challenging it." (*People v. McCullough* (2013) 56 Cal.4th 589, 598.)

Joseph's reliance on *Calhoun* does not alter our conclusion.  In that case, the appellate court considered the merits of the defendant's belated venue claim without addressing the Attorney General's forfeiture argument. *Calhoun* observed "the grounds for challenging venue first appeared during trial" because the prosecution witness testified, in contrast to her preliminary hearing testimony, that she could not remember where the crime occurred. (*Calhoun, supra,* 38 Cal.App.5th at pp. 311 & fn. 4, 312.)  On the merits,

---

[5] "Under section 777, 'venue lies in the superior court of the county in which the crime was committed, and a defendant may be tried there.' " (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 310 (*Calhoun*).)  Section 781 expands venue " 'beyond the single county in which a crime may be said to have been committed.' " (*People v. Betts* (2005) 34 Cal.4th 1039, 1057 (*Betts*).)  Under section 781, " 'venue is proper in a county where only preliminary arrangements or acts leading to commission of the crime occur, even though such acts are not essential elements of the charged offense.' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1118.)  Section 784.7, subdivision (a) governs multiple violations of certain sex offenses (including those charged in this case) in more than one jurisdiction.  Venue is proper for any of the offenses "and for any offenses properly joinable with that offense . . . in any jurisdiction where at least one of the offenses occurred."

*Calhoun* found no contradiction between the witness's preliminary hearing and trial testimony and concluded the preliminary hearing testimony was "sufficient to support venue." (*Id.* at p. 312.)

Here and in contrast to *Calhoun*, there was even less of a basis to assert that the trial testimony somehow reopened the venue question, since no new or different testimony has been identified that arguably undermined the grand jury testimony. Joseph has not established the grounds for challenging venue were unapparent before trial, nor that the evidence at trial "eliminated the factual basis for . . . venue." (*Calhoun, supra,* 38 Cal.App.5th at pp. 311–312.)

C.      Trial Counsel Was Not Ineffective for Failing to Timely Challenge Venue

Joseph contends trial counsel's failure to raise a timely venue objection was ineffective assistance of counsel. To establish ineffective assistance, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Joseph has not established trial counsel's performance was deficient. "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai, supra*, 57 Cal.4th at p. 1009.) Here, trial counsel may have concluded venue in Contra Costa County was proper. (*People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 169, 172 [failure to timely challenge venue not objectively unreasonable where some evidence indicated venue was proper].)

13

Alternatively, counsel may have preferred venue in Contra Costa County for "strategic reasons." (*People v. Simon, supra,* 25 Cal.4th at p. 1104.) On this record, Joseph has not demonstrated trial counsel's representation was deficient.

Nor has Joseph established prejudice. He has not shown venue in Contra Costa County inconvenienced him or impaired his ability to mount a defense (*Calhoun, supra,* 38 Cal.App.5th at p. 312) and he has offered no support for his speculative claim that charges would not have been brought against him in Alameda County after the 2015 police investigation produced overwhelming evidence of the human trafficking operation. (*People v. Gbadebo-Soda*, *supra,* 38 Cal.App.4th at pp. 169, 172 [no prejudice from trial counsel's failure to object to venue].)

III.

*California Lacked Jurisdiction over Counts 17 Through 21,*
*the Rapes of Jane Doe 5 in North Carolina*

Third, Joseph contends counts 17 through 21 must be reversed because California lacked territorial jurisdiction over those crimes.

A.     Background

At trial, Doe 5 testified Joseph raped her in North Carolina. Joseph's motion for acquittal argued the trial court lacked territorial jurisdiction over counts 17 through 21 because the crimes occurred "outside of the state of California." In opposition, the prosecution argued the human trafficking conspiracy originated in California, which conferred "jurisdiction over all of the rest of the counts," including "the rapes . . . wherever they occurred," because the rapes facilitated the human trafficking. The court denied the motion and the jury convicted Joseph of the charges.

14

B.    The Trial Court Had No Territorial Jurisdiction over Crimes
      That Occurred Entirely in North Carolina

"Territorial jurisdiction establishes the court's authority to try the defendant."  The prosecution has the burden to establish territorial jurisdiction by a preponderance of the evidence and may satisfy its burden through circumstantial evidence.  (*Betts*, *supra,* 34 Cal.4th at pp. 1050, 1053; *People v. Crew* (2003) 31 Cal.4th 822, 834.)  The existence of territorial jurisdiction may be "decided by the trial court on a motion for entry of a judgment of acquittal pursuant to section 1118.1."  (*Betts,* at p. 1048.)  If unsupported by substantial evidence, a trial court's ruling on territorial jurisdiction must be reversed.  (*Fortner v. Superior Court* (2013) 217 Cal.App.4th 1360, 1364 (*Fortner*).)

"A California court's territorial jurisdiction is defined by statute." (*Fortner, supra,* 217 Cal.App.4th at p. 1366.)  It is undisputed counts 17 through 21 occurred in North Carolina.  As a result, section 777, which confers jurisdiction over crimes committed in this state, does not apply. The question is whether sections 27 and 778a—which "apply to criminal activity that spans more than one state"—confer jurisdiction.  (*Betts, supra,* 34 Cal.4th at p. 1053.)  The answer is no.

Section 27, subdivision (a)(1) "permits the punishment of a defendant under California law for any crime committed 'in whole or in part' in the state."  (*Betts, supra,* 34 Cal.4th at p. 1047.)  At trial, the prosecution presented no evidence that any "part" of the rapes alleged in counts 17 through 21 were committed by Joseph in California.  As a result, section 27 does not confer jurisdiction.  (*Fortner, supra,* 217 Cal.App.4th at p. 1364 [no jurisdiction under section 27 for domestic dispute committed in Hawaii].)

Section 778a, subdivision (a) confers jurisdiction over crimes committed outside California "if the defendant formed the requisite intent within this

15

state and committed any act, including preparatory acts, showing that the crimes were initiated within California." (*People v. Crew, supra,* 31 Cal.4th at p. 834, citing § 778a.) Under this statute, "California has territorial jurisdiction over an offense if the defendant, with the requisite intent, does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense." (*Betts, supra,* 34 Cal.4th at p. 1047.)

Section 788a does not confer jurisdiction over counts 17 through 21 because there is no evidence Joseph formed an intent to rape Doe 5 in California, nor any evidence he took preparatory acts in this state toward the completion of the rapes. To the contrary, the evidence establishes the rapes were "commenced" and "completed" in North Carolina. (*Fortner, supra,* 217 Cal.App.4th at p. 1364.) The People contend there was a "connection" between the crimes and California, pointing to Doe 5's undated visits to California for vacation and her travel to California for plastic surgery. We are not persuaded. On this record, neither Doe 5's travel to California on unspecified dates, nor her visit to California *after* the rapes for surgery, tended to show Joseph formed the intent to rape Doe 5 in California, nor that he performed a preparatory act in this state to facilitate the rapes. (*Id.* at p. 1365.)

Equally unpersuasive is the People's contention that California has jurisdiction over counts 17 through 21 because the rapes furthered the human trafficking enterprise, which originated in California. Even if we accept the premise that the rapes allowed Joseph to exert control over Doe 5, which in turn enhanced his ability to force Doe 5 to prostitute herself, there is no evidence that Joseph, with the requisite intent, performed a preparatory act in California toward completion of the offense of *rape.* That the human trafficking enterprise began in California does not satisfy the statutory

16

prerequisites for territorial jurisdiction *over the rapes* committed in North Carolina.[6]

In arguing the trial court properly exercised jurisdiction, the People rely on two cases, *Betts, supra,* 34 Cal.4th 1039 and *People v. Renteria* (2008) 165 Cal.App.4th 1108 (*Renteria*). Neither case assists them. In *Betts*, the defendant drove the victims in his truck through California and into Oregon, where he molested them. (*Betts,* at pp. 1055–1056.) The California Supreme Court upheld the trial court's jurisdictional finding, concluding the defendant formed an intent to molest his victims in California; that the act of driving the victims across the state was more than de minimus; and that California had "a legitimate interest in protecting its residents from criminal conduct." (*Ibid.*)

In *Renteria*, the defendant drove a stolen car on a California freeway. While being pursued by law enforcement, the defendant drove onto federal land. The appellate court held California had jurisdiction under section 778a "even though the crime culminated on a federal enclave" because the defendant formed the intent to flee while driving on a California highway and, as a "preparatory act," exited the freeway to avoid the police officer. (*Renteria, supra,* 165 Cal.App.4th at pp. 1117–1119.)

These cases are easily distinguishable. Unlike *Betts* and *Renteria*, the record is devoid of evidence that Joseph formed the intent to rape Doe 5 in California or that he engaged in any conduct in California to further the completion of the rapes in North Carolina. And unlike the victims in *Betts*,

---

[6] We also reject the People's argument that section 778a confers jurisdiction over the rapes because Joseph deposited cash from the proceeds of his human trafficking operation in California. The People's record citations do not show Joseph deposited proceeds from *raping* Doe 5 in California bank accounts and they cite no authority demonstrating territorial jurisdiction exists anywhere proceeds from an illegal enterprise are located.

Doe 5 was not a California resident at the time of the rapes.  Neither *Betts* nor *Renteria* support the exercise of jurisdiction over counts 17 through 21 "any more than the applicable California statutes do."  (*Fortner, supra,* 217 Cal.App.4th at pp. 1366–1367.)

Substantial evidence does not support the trial court's exercise of jurisdiction over counts 17 through 21.  "Without jurisdiction, a court has no authority to act in the matter and cannot enter judgment either in favor of or against the defendant."  (*Betts*, *supra*, 34 Cal.4th at p. 1050.)  Because California lacked jurisdiction over counts 17 through 21, the judgment the court entered on those counts is a " 'legal nullity' " and must be reversed.  (*People v. Vasilyan* (2009) 174 Cal.App.4th 443, 450.)

IV.

*The Statute of Limitations Does Not Bar Counts 5 Through 16*

Joseph's final contention is counts 5 through 16—which alleged he committed rape, sodomy, and forcible oral copulation against Does 1, 2, and 3 in 2001 and 2002—are time-barred.[7]  A defendant may assert the statute of limitations for the first time on appeal.  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1048.)  " '[A]pplication of the statute of limitations on undisputed facts is a purely legal question' reviewed de novo."  (*People v. Brown* (2018) 23 Cal.App.5th 765, 772.)

"Statutes of limitations in criminal cases are generally based upon the offense committed and are tied to the seriousness of the offense. . . .  [¶] . . . For a crime punishable by death or life imprisonment, there is no limitation on the commencement of prosecution."  (*People v. Sedillo, supra,* 235 Cal.App.4th at p. 1048, fn. omitted; § 799.)  An " 'offense is deemed

---

[7] We limit our discussion to the charges for which Joseph was convicted.

18

punishable by the maximum punishment prescribed by statute for the offense,'" excluding "'[a]ny enhancement of punishment prescribed by statute.'" (*Sedillo*, at p. 1048, quoting § 805, subd. (a).) In this context, "enhancement" is used in a "narrow" and "technical" sense to refer to "an additional prison term added to a base term." (*Anthony v. Superior Court* (2010) 188 Cal.App.4th 700, 718, 719.)

Section 667.61—known as the "One Strike" law—is an "'alternative sentencing scheme,'" not a "true 'enhancement.'" (*People v. Jones* (1997) 58 Cal.App.4th 693, 709 & fn. 9.) Under the One Strike law, sex offenses committed against more than one victim are punishable by imprisonment for 15 years to life. (*Jones,* at pp. 703, 705; § 667.61, subds. (b), (e).) Punishable by life imprisonment, these offenses may be prosecuted at any time. (*People v. Perez* (2010) 182 Cal.App.4th 231 (*Perez*).)

*Perez* is on point. There, the jury convicted the defendant of several counts of committing a lewd act on a child in violation of section 288, subdivision (b) and found true a multiple-victim allegation for each count. (*Perez, supra,* 182 Cal.App.4th at p. 234.) The defendant appealed, arguing two of the counts were time-barred. (*Ibid.*) *Perez* disagreed. It explained: "Section 667.61 is an alternate penalty scheme that, when charged, defines the length of imprisonment for the substantive offense of violating section 288, subdivision (b)(1). Thus, the unlimited timeframe for prosecution set out in section 799 for an offense 'punishable by . . . imprisonment in the state prison for life . . .' applies, given that defendant was found guilty of violating section 288, subdivision (b)(1) *and* . . . was found guilty of another such violation involving another victim." (*Perez,* at pp. 239–240.)

This case is like *Perez*. Here, the jury convicted Joseph of the sex offenses and found the multiple victim allegation true, which rendered the

offenses punishable by imprisonment for 15 years to life. (§ 667.61, subds. (b), (e).) As in *Perez*, section 799 applies to counts 5 through 16. Thus, these offenses may be prosecuted at any time. (*Perez, supra,* 182 Cal.App.4th at p. 242.)

Joseph urges us to follow *People v. Turner* (2005) 134 Cal.App.4th 1591. We decline Joseph's suggestion and reject his reliance on *Turner* for the reasons discussed in *Perez* and subsequent cases. (*Anthony v. Superior Court, supra,* 188 Cal.App.4th at pp. 712–718.) Briefly, we note *Turner* concerned the "Three Strikes" law, which is aimed at punishing recidivists based on acts found true in an earlier case. This case involves the One Strike law, which is aimed at "ensur[ing] serious sexual offenders receive long prison sentences whether or not they have any prior convictions" (*People v. Wutzke* (2002) 28 Cal.4th 923, 929) and which requires the prosecution to prove the defendant committed the offenses against more than one victim. (§ 667.61, subd. (e)(4).) Joseph's sentence was not based on past criminal behavior, but on his commission of specified sex offenses against multiple victims. The statute of limitations does not bar counts 5 through 16.

### DISPOSITION

We reverse the convictions for counts 17 to 21, strike the court operations assessments (§ 1465.8) and criminal conviction assessments (Gov. Code, § 70373) attached to counts 17 to 21, affirm the remaining convictions (counts 1–2, 5–16), and modify the judgment to reflect a total sentence of 119 years, plus 15 years to life, in state prison. As modified, we affirm the judgment. We direct the trial court to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

                                  _____

                                  Seligman, J.[*]

WE CONCUR:


_____

Simons, Acting P. J.


_____

Needham, J.


A153494

---

[*] Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Superior Court of Contra Costa County, Hon. Barry Baskin

James Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Ashley Harlan, Deputy Attorneys General, for Plaintiff and Respondent.